J-S44037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ABDEL ANDERSON-MYLES | : | |
| | : | |
| Appellant | : | No. 2891 EDA 2023 |

Appeal from the PCRA Order Entered October 10, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003553-2015

BEFORE: NICHOLS, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED JANUARY 14, 2026**

Abdel Anderson-Myles ("Anderson-Myles") appeals from the order dismissing his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

This Court previously summarized the testimony presented by the victim, A.P., at Anderson-Myles' non-jury trial:

> . . . A.P., who was 17 years old at the time of the incident, testified that Anderson-Myles[, then eighteen years old,] raped her at his home in Upper Darby on February 17, 2015. A.P. stated that she met Anderson-Myles on Instagram and had known him for approximately two to three weeks prior to the incident. A.P. testified that her only previous interaction with Anderson-Myles had been through texting or messaging on Instagram and that she had never met him in person prior to February 17. On that date, A.P. stated that Anderson-Myles suggested they meet at his house. A.P. took a bus to his neighborhood; Anderson-Myles met her at the bus stop and the two went to his house together. A.P.

---

[1] **See** 42 Pa.C.S.A §§ 9541-9546.

testified that, as she and Anderson-Myles arrived at the residence, Anderson-Myles' father was just leaving to go to the store. She heard the sounds of a video game, "like somebody was upstairs." [N.T., 12/28/17,] at 14. A.P. and Anderson-Myles sat down "right next to each other" on a two-seat couch, and he turned on Netflix. *Id*. at 16.

As the two watched Netflix, they "sat a little closer to each other, [and] got comfortable." *Id*. at 17. A.P. testified that, at that point, Anderson-Myles "tried to come on to [her]" and aggressively touched her. *Id*. He touched her inner-thigh area and then attempted to kiss her, at which point she half-heartedly pushed him away. A.P. testified that Anderson-Myles then stood up, pulled out his penis and "forced [her] to suck it" while pulling on her hair. *Id*. at 20. Anderson-Myles then pushed her face into the couch, causing A.P.'s contact lens[] to fall out. He then pulled her leggings down and placed his penis in her vagina.

When Anderson-Myles finished, A.P. stated that she pulled her leggings up and went into the kitchen to put her contact lens[] back in her eye[]. A.P. testified that Anderson-Myles told her she "better not . . . tell anyone." *Id*. at 26. He also mentioned that his brother was upstairs and had heard everything. When A.P. went to leave Anderson-Myles' house to go to the store, he insisted on accompanying her and followed her around the store while she shopped and checked out. As she left the store, he continued to follow her. A.P. testified that she then saw her bus coming, so she ran to catch it.

After A.P. arrived home, . . . she told her mother what had happened. Her mother did not have a car, so they waited for her grandfather to arrive, at which time he took A.P. to the hospital. She subsequently gave a statement to police after hospital staff encouraged her to do so.

*Commonwealth v. Anderson-Myles*, 241 A.3d 361 (Pa. Super. 2020) (unpublished memorandum at 2-6) (some record citations omitted).

Following A.P.'s testimony, the Commonwealth admitted the Upper Darby Police Department incident report ("Incident Report") through stipulation as evidence of what the investigating officers "would testify to," if

called. N.T., 12/28/17, at 39; *see also* Trial Exhibit C-1. The Commonwealth

then rested.

This Court further summarized the testimony of the three witnesses

presented by the defense:

> Anderson-Myles' grandmother, Joan Marie Patterson
> [("Patterson")] . . . testified that she first met A.P. when A.P.
> visited Patterson's daughter's house with Anderson-Myles.
> However, Patterson testified that she "didn't really know her until
> she came to [Patterson's] house on a Sunday." [N.T., 3/9/18,] at
> 7-8. Patterson testified that, on that occasion, A.P. acted "like she
> didn't want to be seen and kept her coat on . . . like she felt
> uncomfortable." *Id*. at 8. Later, while Patterson was making
> dinner, A.P. and Anderson-Myles went upstairs, where A.P. came
> on to Anderson-Myles and took off her clothes. Patterson stated
> that she "saw her[,] like[,] halfway clothed, she was almost
> clothed and then[,] like[,] she was [lying] in the bed and
> [Patterson] pulled the blanket up and she had no underwear on."
> *Id*. [at 9.] Patterson testified that she then asked A.P. to leave
> and A.P. got angry with her. Patterson stated that she saw A.P.
> one more time at her daughter's house, which "wasn't too long
> after [Patterson] threw her out" of her house. *Id*. at 12.
>
> Tracey Nicole Mamadou [("Mother")], Anderson-Myles'
> mother, also testified on his behalf. She stated that A.P. was one
> of her son's friends and that A.P. "visited [Mother's] house before
> and [they] all went out before." *Id*. at 25. [Mother] testified that
> she had met A.P. on three occasions prior to the incident in
> question. The first time she met A.P., [Mother] took her and
> Anderson-Myles to the movies. On their second meeting, A.P.
> "came to [Mother's] house with a friend and did [Mother's]
> daughter's hair[.]" *Id*. at 26. On their third meeting, A.P. came
> to visit Anderson-Myles at [Mother's] home. [Mother] testified
> that Anderson-Myles knew A.P. from school.
>
> Finally, Gregory Garner [("Garner")], a close friend of
> Anderson-Myles, testified for the defense. Garner testified that
> he attended Upper Darby High School with Anderson-Myles and
> knew A.P. through him. Garner testified that he had seen them
> together three times and each time "they were touchy, you know,
> all up on each other. I seen [sic] them kiss multiple times." *Id*.

at 33. Garner had also seen A.P. in the hallways at Upper Darby High School.

***Anderson-Myles***, 241 A.3d 361 (unpublished memorandum at 2-6) (footnote and some record citations omitted). Anderson-Myles did not testify at trial.

Neither the Commonwealth nor Anderson-Myles' trial attorney, Howard Anmuth, Esquire ("Trial Counsel"), sought to introduce the report ("SANE Report") authored by the Sexual Assault Nurse Examiner ("SANE Nurse") who examined A.P. at the hospital and took a statement from her. ***See*** PCRA Exhibit D-3.[2] As relevant here, the SANE Report reflects that A.P. stated she had consensual vaginal intercourse with another individual, C.S., two days prior to the examination. ***See id***. at 2. A.P. also indicated she was unsure whether Anderson-Myles ejaculated or wore a condom. ***See id***. at 4. During the examination, the SANE Nurse collected one buccal swab, three vaginal swabs, and one rectal swab from A.P.

Furthermore, neither party introduced evidence of the DNA testing performed by the Pennsylvania State Police ("PSP") on the swabs collected from A.P. According to a November 7, 2015 report prepared by a PSP forensic

_____

[2] We note that the exhibits Anderson-Myles introduced at the PCRA hearings do not appear in the certified record for this appeal. As the appellant, Anderson-Myles has the "[u]ltimate responsibility" for ensuring the completeness of the certified record. Pa.R.A.P. 1921, *Note*. However, with one exception noted below, the relevant PCRA exhibits appear elsewhere in the certified record and reproduced record. As there is no dispute regarding the accuracy of the exhibits, we may consider them for the purpose of this appeal. ***See Commonwealth v. Brown***, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (noting that we may consider items contained only within the reproduced record were "the accuracy of the reproduction has not been disputed").

scientist, DNA from three individuals was present on the vaginal swabs: A.P.; C.S., whose DNA was in the state DNA database; and a third individual. *See* PCRA Exhibit D-4, at 2. Concerning the third contributor to the DNA on the vaginal swabs, the report stated that "[n]o further interpretation could be made due to an insufficient quantity of DNA." *Id*.

Testing revealed that DNA from three individuals was also present on the rectal swab. *See id*. The DNA found on the rectal swab was a mixture of three individuals, including A.P. and two unknown individuals. *See id*. Unlike the vaginal swabs, the report stated that direct comparison of the unknown major and minor DNA contributors to the rectal swabs to another individual was possible if the Upper Darby Police Department provided a reference sample. *See id*. at 2-3. Notably, at the time of the 2015 DNA testing, the PSP did not have a reference sample from Anderson-Myles.

After the defense rested on March 9, 2018, the trial court took the matter under advisement. The court rendered its verdict on March 19, 2018, finding Anderson-Myles guilty of rape, aggravated indecent assault, indecent assault, involuntary deviate sexual intercourse, corruption of minors, unlawful restraint, and false imprisonment.[3] After the court announced the verdict, the following exchange occurred:

> [TRIAL COUNSEL]: Your Honor, at this point in time, I am going to notify the Court that I am going to have a post-trial

---

[3] *See* 18 Pa.C.S.A. §§ 2902(a)(1), 2903(a), 3121(a)(1), 3123(a)(1), 3125(a)(1), 3126(a)(1), 6301(a)(1)(i).

motion for new evidence that was brought to my attention after the final testimony was given and the new evidence came, I guess, to a witness after that time period, but prior to the verdict.

THE COURT: All right.

[TRIAL COUNSEL]: So I have to make a post-trial motion for that, Your Honor.

THE COURT: And that would be to another Judge or to me?

[TRIAL COUNSEL]: May I confer with counsel?

THE COURT: Yes.

[COMMONWEALTH]: It is — for a second.  It is so new that I think [Trial Counsel] and I should probably review it in full and get some type of a way that we can get it onto paper.  At this particular point, I think it would probably go to Your Honor even though you were the fact finder, there's no way that you'd be prejudiced at this particular point if you're — if you use the information after the decision was made.  Although, I'll still — we'll still confer with our Appeals Department.  We still have to find a way to get this information.

N.T., 3/19/18, at 6-7.

Notwithstanding the above discussion, Trial Counsel did not file a motion for a new trial based on after-discovered evidence.  On August 22, 2019, the court imposed an aggregate sentence of thirteen to twenty-six years' imprisonment, followed by five years' probation.  The court also found Anderson-Myles was a sexually violent predator under the Pennsylvania Sex Offender Registration and Notification Act.[4]

Trial Counsel filed a post-sentence motion, requesting the sole relief that the trial court resentence him to a lower aggregate sentence in "the interests

_____

[4] 42 Pa.C.S.A. §§ 9799.10-9799.75.

of justice." Motion for Reconsideration of Sentence, 8/23/19, at 1. After the court denied Anderson-Myles' post-sentence motion, he filed a notice of appeal.[5]

Anderson-Myles retained private counsel who entered his appearance in this Court and filed the appellate brief in his direct appeal.[6] In his sole issue, Anderson-Myles requested a new trial based on the after-discovered evidence of an alleged Instagram conversation between A.P. and Garner several days after trial that called into question the veracity of A.P.'s trial testimony. In addition, Anderson-Myles cited alleged Instagram messages A.P. sent to Anderson-Myles' friend, Isaiah Gray ("Gray"), and text messages she sent to Mother. However, Anderson-Myles did not seek retrial based on the messages to Gray and Mother.

This Court found that Anderson-Myles waived his after-discovered evidence claim because he did not raise it promptly with the trial judge during the post-sentence stage, as required by Pa.R.Crim.P. 720(C). **See Anderson-Myles**, 241 A.3d 361 (unpublished memorandum at 10-12). Therefore, we affirmed his judgment of sentence on October 2, 2020. **See**

---

[5] Trial Counsel, who worked for the Delaware County Office of the Public Defender, took no further action in Anderson-Myles' case following the post-sentence motion. Other public defenders filed the notice of appeal and Pa.R.A.P. 1925(c)(4) notice of intent to file a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967). However, Anderson-Myles' privately retained counsel ultimately filed an advocate's brief in the direct appeal.

[6] The same attorney represents Anderson-Myles in this PCRA proceeding.

*id*. at 12. Anderson-Myles did not file a petition for allowance of appeal in our Supreme Court.

On October 14, 2021, Anderson-Myles filed the underlying timely, counseled PCRA petition.[7] In his petition, Anderson-Myles raised ineffectiveness claims based on Trial Counsel's alleged failure to: (1) request and investigate A.P.'s SANE Report rape kit results; (2) effectively cross-examine A.P. regarding her statements during direct examination and alleged inconsistencies with her prior statements; (3) cross-examine A.P. on allegedly exculpatory messages she sent to Gray, Garner, and Mother or seek to present this evidence as after-discovered evidence following trial; and (4) call Anderson-Myles' stepfather, Idi Mamadou ("Stepfather"), to testify regarding his observations of A.P. and Anderson-Myles on the date of the incident.

_____

[7] A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of Pennsylvania, or at the expiration of time for seeking such review. *See* 42 Pa.C.S.A. § 9545(b)(3). As reflected above, this Court affirmed Anderson-Myles' judgment of sentence on October 2, 2020. Since he did not seek review in our Supreme Court, his judgment of sentence became final on Monday, November 2, 2020, the last day upon which he could have filed a timely petition for allowance of appeal. *See* Pa.R.A.P. 1113(a) (providing that petition for allowance of appeal be filed within thirty days of judgment); *see also* 1 Pa.C.S.A. § 1908 (stating that when last day for a statutory filing deadline falls on a weekend or legal holiday, deadline shall be extended until next business day); Pa.R.A.P. 107 (incorporating 1 Pa.C.S.A. § 1908 with respect to deadlines set forth in the Rules of Appellate Procedure). As Anderson-Myles filed his PCRA petition within one year of November 2, 2020, the petition was timely. *See* 42 Pa.C.S.A § 9545(b)(1) (providing that petitioner must file petition within one year of date judgment of sentence becomes final).

Anderson-Myles appended screenshot images of the messages to his PCRA petition. *See* PCRA Petition, 10/14/21, at Exhibits B-D.

On April 26, 2022, Anderson-Myles filed a motion for post-conviction DNA testing pursuant to Section 9543.1 of the PCRA. *See* 42 Pa.C.S.A. § 9543.1. In the motion, Anderson-Myles consented to provide a DNA sample and requested the PCRA court order a comparison of his DNA to that of the unknown individuals present on swabs collected by the SANE Nurse.

The PCRA court held evidentiary hearings on April 27 and June 28, 2022.[8] Stepfather testified to the following. He returned home at 4:00 p.m. on February 17, 2015 and found Anderson-Myles and "his girlfriend," A.P., sitting on the couch and watching television. N.T., 4/27/22, at 9-12, 18. Anderson-Myles and A.P. seemed "friendly with each other," and there was no indication that an argument or struggle had occurred. *Id*. at 11, 13. As Stepfather was leaving the home ten to fifteen minutes later, he "asked [Anderson-Myles and A.P.] to leave because of the rule of the house" that "kids [were not] supposed to have . . . company when [the parents were] not home." *Id*. at 12. A.P. stated that she had the same rule in her home. *See id*. at 13. Stepfather watched Anderson-Myles and A.P. walk away from the home towards a bus stop. *See id*.

Stepfather indicated in a certification attached to the PCRA petition that he was willing to testify as to the above-described events at trial, and he

_____

[8] The same jurist presided over Anderson-Myles' trial and this PCRA matter.

reiterated during his PCRA testimony that all the representations in his certification were accurate. ***See id***. at 9; ***see also*** PCRA Exhibit D-1-E, at 1. Trial Counsel did not contact Stepfather to discuss Anderson-Myles' case. ***See*** N.T., 4/27/22, at 22. However, Stepfather also did not attempt to contact Trial Counsel regarding the case. ***See id***. 20. Although Stepfather was aware of the trial proceedings, he was not present during either of the two days of trial. ***See id***. at 19-20. He explained that he was not at one of the trial dates because of an out-of-state funeral of a close friend and the other date because he "wasn't close to" Mother and "was having a domestic situation with [her] at that time." ***Id***. at 20.

Mother testified to the following. Mother engaged in the following text message conversation with A.P. on April 15, 2016:

> [A.P.:] Hey miss Tracey this [A.P.] just tell ur fucking son to leave that bitch and choose me and I'll stop with all this if not I make sure Kisheen goes and rot in fucking jail . . . tell him to text this number
>
> [Mother:] He cannot contact you or he'll get in trouble
>
> [Mother:] You can talk to me

PCRA Exhibit D-1-B, at 4; ***see also*** N.T., 4/27/22, at 26-27. A.P. did not respond to Mother's messages. ***See*** N.T., 4/27/22, at 27. Mother explained that Kisheen is Anderson-Myles' middle name, but he usually used his first name with friends. ***See id***. at 29. Mother recognized A.P.'s phone number as she had "called [Mother's] phone sometimes to talk about [Anderson-Myles], and then he called [A.P.] on this number." ***Id***. at 28.

Mother took a screenshot of the text messages and provided them to Trial Counsel prior to trial. *See id*. at 27-28. Trial Counsel informed Mother that the messages "could [not] be used in court because [they] came from a cell phone and anybody could have [done] it." *Id*. at 28. Mother was willing to answer questions regarding the messages from A.P., but Trial Counsel did not ask her any questions about them during her trial testimony. *See id*. at 30-32. Mother was also aware that Gray and Garner provided Trial Counsel with messages from A.P. *See id*. at 29-30.

Gray testified to the following. Gray became friends with Anderson-Myles in 2012, when they were in high school. *See id*. at 40, 48. Although A.P. went to the same high school, Gray did not know A.P. *See id*. at 39. In February 2018 — between the two dates of Anderson-Myles' trial — Gray received a series of messages on Instagram from a user named "bhadhabits_." *See id*. at 40-41, 47, 51; *see also* PCRA Exhibit D-1-C, at 3-7. Gray had no prior interaction with "bhadhabits_," who he believed was "a female coming on to" him. N.T., 4/27/22, at 40, 50-51. After Gray mentioned that he lived in Lansdowne, Pennsylvania, "bhadhabits_" stated the following: "I'm from jersey but I got my own place in overbrook and ew lansdowne . . . I use to talk to some cornball ass n***a around there[.]" PCRA Exhibit D-1-

C, at 4 (emojis omitted).[9]   After several more messages, "bhadhabits_"

returned to the subject of the individual she knew from Lansdowne:

> Yea but the n****a I talked to around there name was Abdel I love him and all that but he had the nerve to cheat on me multiple times then fuck my friend so I got his ass caught up and lied to the cops about him raping me can u believe that shit . . . plus he did me dirty Ima a lot of other ways also what goes around comes around . . .
>
> *     *     *
>
> Yea but I ain't gotta worry about Abdel no more u kno him?

*Id*. at 6-7.

After he received the Instagram messages, Gray "told [Anderson-Myles]

to notify his lawyer."  N.T., 4/27/22, at 47.  Gray did not inform anyone else

of this conversation, and he "never heard from" Trial Counsel. *Id*.  If called at

the second day of trial on March 9, 2018, Gray would have been willing to

testify regarding the Instagram messages.  *Id*. at 48.

Garner testified as follows.  He knew Anderson-Myles and A.P. from high

school and understood that they were in a "boyfriend and girlfriend"

relationship at the time of the alleged rape.  *Id*. at 57, 60.  A day or two after

Garner testified to that effect at trial, he received messages on Instagram

from the "bhadhabits_" user, who he understood to be A.P.  *See id*. at 57-61,

65, 69; *see also* PCRA Exhibit D-1-C, at 3-4.   Garner described the

conversation as "an aha or a rub-it-in-your-face type of message from" A.P.

_____

[9] We quote the messages verbatim, except where indicated.

N.T., 4/27/22, at 59.  In the course of the conversation, "bhadhabits_" made various statements apparently referencing Anderson-Myles and the trial, including: "when his ass lock up ima get him touched in there and no can't do shit about it that dumb ass judge gona believe what I said;" "Idc he left me for another bitch I told him not to play in my face;" and "it is what it is and that judge and da was dumb enough to believe me."  PCRA Exhibit D-1-C, at 3-4.

After he received the Instagram messages, Garner "immediately" sent them by email to Trial Counsel.  N.T., 4/27/22, at 64.  Trial Counsel did not respond to Garner.  **See id**.  If recalled to the stand, Garner would have been willing to testify regarding the Instagram conversation.  **See id**. at 65.

Trial Counsel testified that "[t]here's not a lot [he] remember[ed] about" Anderson-Myles' case.  N.T., 6/28/22, at 16.  Trial Counsel did not recall whether he: (1) requested or reviewed DNA evidence; (2) retained a DNA expert; or (3) requested or reviewed A.P.'s rape kit.  **See id**. at 14-16, 26, 36.  Trial Counsel did not recall speaking to Stepfather prior to trial or why he did not do so.  **See id**. at 12-14, 36.  Trial Counsel acknowledged, however, that he wrote Stepfather's name in his notes from an early interview with Anderson-Myles.  **See id**. at 14.  Trial Counsel also did not recall why he did not cross-examine A.P. regarding alleged inconsistencies between her trial testimony and her statements recorded in the Incident Report and the SANE Report.  **See id**. at 17-28, 39-40.

When asked whether he recalled exculpatory text or Instagram messages, Trial Counsel testified "the only thing [he] remember[ed] is one time" Anderson-Myles showed him text messages on a phone, which Trial Counsel then showed to the assistant district attorney, Christopher Boggs, Esquire ("ADA Boggs"). *Id*. at 31. Trial Counsel did not recall reviewing Instagram messages. *See id*. at 30-31. Trial Counsel stated that the defense he presented at trial was that the incident did not "happen the way [A.P.] said and that [she and Anderson-Myles] knew each other prior to" the incident. *Id*. at 8.

Anderson-Myles testified that he showed Trial Counsel the text and Instagram messages that A.P. allegedly sent to Mother, Gray, and Garner. *See id*. at 54-57. Anderson-Myles stated that he, Trial Counsel, and ADA Boggs "viewed [the messages together] outside the courtroom." *Id*. at 62.

The Commonwealth called ADA Boggs, who testified to the following. He believed the text and Instagram messages were part of "a long line of suspicious communications purporting to come from [A.P.] saying that the entire case was a fabrication." *Id*. at 66. At a bail hearing early in the case, ADA Boggs received "a handwritten letter puport[ing] to be from the victim saying . . . exactly why she was lying." *Id*. A.P. denied writing the letter, and ADA Boggs obtained a handwriting sample from A.P.'s high school, which did not match the letter. *See id*. at 66-68. A.P. also denied authoring the text and Instagram messages and that "bhadhabits_" was her Instagram username. *See id*. at 67-69. A detective, whom ADA Boggs requested to

investigate the username, found nothing to authenticate it. *See id*. at 68-69.

On cross-examination, PCRA counsel showed ADA Boggs a printout of the Instagram page for the user "Bhad_Habits," with a profile picture that allegedly depicted A.P. *See id*. at 70-72. Notably, the underscore in the name for the user on the printout was in a different location than the user who allegedly sent the messages to Gray and Garner. *See id*. at 72 (PCRA counsel stating that the printout showed a "[c]olored picture of [A.P.] with the term Bhad Habits underneath it, Bhad_Habits").[10]

On January 27, 2023, the PCRA court entered orders dismissing Anderson-Myles' PCRA petition and motion for post-conviction DNA testing. Two weeks later, however, the court entered an order vacating its dismissal orders. The PCRA court held an additional evidentiary hearing on February 27, 2023. At the hearing, Anderson-Myles testified that he was innocent of the charges and gave his consent for post-conviction DNA testing. *See* N.T., 2/27/23, at 8-12. Anderson-Myles testified that he had consensual sexual relationship with A.P., although he denied having sex with her on February 17, 2015. *See id*. at 14. Anderson-Myles could not provide a specific date of

_____

[10] While the PCRA court admitted the printout as Exhibit D-7, the printout does not appear in the certified record for this appeal. We reiterate that Anderson-Myles, as the appellant, bore the "[u]ltimate responsibility" to ensure the completeness of the record. Pa.R.A.P. 1921, *Note*. However, we note that PCRA counsel described the content of Exhibit D-7 on the record at the June 28, 2022 hearing, and we rely on that description herein. *See* N.T., 6/28/22, at 70, 72.

their last sexual contact but indicated it was "probably weeks beforehand." *Id*. at 15.

On May 8, 2023, the PCRA court entered an order granting the motion for DNA testing and authorizing the comparison of Anderson-Myles' DNA to the unknown individuals from the rectal swab from A.P. The PSP issued a new report on August 7, 2023 finding that Anderson-Myles "can be included as a potential contributor to th[e DNA] mixture profile." Commonwealth's Motion to Dismiss PCRA Petitions, 9/1/23, Exhibit 2, at 1. Specifically, the report stated: "The DNA profile obtained from [the rectal swab] is 1.6 quintillion . . . times more likely if it originated from [A.P.,] Anderson-Myles . . ., and an unknown, unrelated individual than if it had originated from [A.P.] and two . . . . other unknown, unrelated individuals . . . ." *Id*.

Anderson-Myles did not file a subsequent petition based on these DNA results, as he could have under Section 9543.1(f). On September 6, 2023, the PCRA court issued Pa.R.Crim.P. 907 notice of its intent to dismiss the PCRA petition. Anderson-Myles filed a response to the Rule 907 notice, in which he argued that the PSP's "methodology" in its August 7, 2023 report was "suspect" and the DNA "evidence is unreliable to show" he had sexual intercourse with A.P. on February 17, 2015. Rule 907 Response, 10/5/23, at 3-4. In addition, Anderson-Myles offered a report from a forensic biologist, Katherine L. Cross, M.S., in support of his theory. *See id*., Exhibit.

On October 10, 2023, the PCRA court entered an order dismissing the petition. Anderson-Myles filed a timely notice of appeal. Both he and the PCRA court complied with Pa.R.A.P. 1925(b).[11]

Anderson-Myles raises the following issues on appeal:

1) Where there was an expert report reflecting the DNA testing was either unreliable and/or exculpatory, did the [PCRA] court err and abuse its discretion when it denied relief on the basis of that testing without holding a hearing where the expert testified?

2) Where there was a SANE Nurse Report and DNA which would have shown that [Anderson-Myles] did not have sexual intercourse with [A.P.] on the day of the incident, was [Trial C]ounsel ineffective for failing to obtain and investigate the DNA and the contents of the report?

[3)] Was [T]rial [C]ounsel ineffective for failing to request and review the rape kit, the SANE Nurse Report, and the results of the DNA testing, which all provided exculpatory evidence, including statements by [A.P.] which were vastly different than her trial testimony?

[4)] Was [T]rial [C]ounsel ineffective for failing to cross-examine [A.P.] on numerous inconsistencies in her testimony and where he failed to request and review the SANE Nurse Report, which provided fertile grounds for cross-examination of [A.P.]?

[5)] Did the [PCRA] court err in denying PCRA relief when it was clear that [Trial C]ounsel was ineffective for failing to call [S]tepfather who was present at the time that the alleged

_____

[11] The PCRA court's initial March 6, 2023 Rule 1925(a) opinion addressed only one of Anderson-Myles' seven appellate issues. In an April 8, 2025 judgment order, this panel remanded and directed the PCRA court to prepare a supplemental Rule 1925(a) opinion addressing the merits of Anderson-Myles' remaining issues. The PCRA court complied with this directive and filed a supplemental opinion on June 18, 2025. After further appellate briefing, the merits of this appeal are now ripe for disposition.

incident occurred and who testified that the incident could not have occurred as [A.P.] testified?

6)   Was [T]rial [C]ounsel ineffective for failing to present Instagram posts and texts from three different sources reflecting that [A.P.'s] motive to implicate [Anderson-Myles] in this alleged rape was because she was jealous that he was with another woman, and also reflecting that [Anderson-Myles] was innocent of this crime?

7)   Was the accumulation of these claims sufficient to compel the grant of a new trial if this Court finds that individually, they were not?

Anderson-Myles' Brief at 3-4 (reordered for ease of disposition).

Anderson-Myles first challenges the trial court's refusal to hold a hearing following the grant of his motion for post-conviction DNA testing, wherein he could have presented the testimony of his forensic biologist expert.

When examining the propriety of an order resolving a request for post-conviction DNA testing, we employ the well-established standard of review for review of denials of PCRA petitions. *See Commonwealth v. Hardy*, 337 A.3d 385, 404 (Pa. 2025). On appeal from the denial of a PCRA petition, our task is to determine whether the record supports the PCRA court's factual determinations and its legal conclusions are free of error. *See Commonwealth v. Ortiz-Pagan*, 322 A.3d 247, 251 (Pa. Super. 2024). When supported by the record, the PCRA court's credibility determinations are binding on this Court. *See id*. However, we review the court's legal conclusions *de novo*. *See id*. We confine our review to the findings of the PCRA court and the evidence of record, which we view in the light most favorable to the Commonwealth, the party who prevailed below. *See id*.

Section 9543.1 of the PCRA governs motions for post-conviction DNA testing. *See* 42 Pa.C.S.A. § 9543.1. In **Hardy**, our Supreme Court explained the procedural requirements of Section 9543.1:

A motion for DNA testing under Section 9543.1 is not a PCRA petition. Section 9543.1 governs a proceeding that is substantively and conceptually distinct from other PCRA litigation. Although the legislature placed this provision within the larger statutory framework of the PCRA . . . the litigation of a motion for DNA testing under Section 9543.1 is, in substance, a wholly separate proceeding from litigation of a PCRA petition. Section 9543.1 grants persons convicted of a crime in Pennsylvania the right to apply for DNA testing of "specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction." [42 Pa.C.S.A. § 9543.1(a)(1).] The applicant is required to take certain threshold steps, such as identifying the specific evidence at issue, consenting to provide samples of bodily fluids to be used in the DNA testing, and acknowledging that his own DNA will be uploaded to law enforcement databases and could be used as evidence in other prosecutions. . . .

Actual innocence of the crime is what the statute primarily aims to uncover. To that end, . . . the applicant is required to "present a prima facie case" demonstrating that the "identity of or the participation in the crime by the perpetrator was at issue in the proceedings" that resulted in the conviction, and that "DNA testing of the specific evidence, assuming exculpatory results, would establish" the applicant's "actual innocence of the offense for which the applicant was convicted." [42 Pa.C.S.A. 9543.1(c)(3)(i), (ii)(A).] . . .

**Hardy**, 337 A.3d at 389-90 (footnotes and some quotation marks omitted).

This appeal requires our consideration of Section 9543.1(f), which pertains to the procedure following the grant of a motion for DNA testing and the completion of testing. This section provides, in relevant part:

(1) After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) . . . , during the one-year period beginning on the date

on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) . . . .

(2) Upon receipt of a petition filed under paragraph (1), the court shall consider the petition along with any answer filed by the Commonwealth and shall conduct a hearing thereon.

(3) In any hearing on a petition for postconviction relief filed under paragraph (1), the court shall determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi).

\*       \*       \*

(6) If DNA testing conclusively identifies the DNA profile of the applicant on probative and inculpatory evidence, the court shall dismiss the petition and may make any further orders that are appropriate. . . .

42 Pa.C.S.A. 9543.1(f)(1)-(3), (6).

In **Commonwealth v. Scarborough**, 64 A.3d 602 (Pa. 2013), our Supreme Court held that Section 9543.1(f) establishes an "explicit statutory demarcation between the culmination of the DNA testing litigation and the commencement of the litigation of a later-filed PCRA petition." **Id**. at 610. Thus, "an order granting a motion for DNA testing terminates the existing process between the parties and decides the merits of the sole claim raised in the motion," and "the filing of a later PCRA petition by the successful movant constitutes the commencement of separate and new litigation." **Id**.; **see also Hardy**, 337 A.3d at 391 (stating that "[t]he DNA test results contemplated by Section 9543.1 are intended to lead directly to a new PCRA petition").

Anderson-Myles argues that, although the results of the post-conviction DNA testing showed that he was a contributor to the DNA found on the rectal

swab, the PCRA court abused its discretion and erred by not holding a hearing to allow his DNA expert to testify. Anderson-Myles notes that he admitted to prior sexual relations with A.P., but he maintained that this contact was weeks prior to February 17, 2015. Therefore, he contends that the principal issue that the DNA testing sought to address "was whether he had sexual relations on the **day** of the rape reported by A.P., not some time before." Anderson-Myles' Brief at 23 (emphasis in original). On this question, he asserts that the results of the DNA test were "**exculpatory**, rather than **inculpatory**." **Id**. at 26 (emphases added).

Anderson-Myles avers that his DNA expert's testimony would have demonstrated four reasons why the post-conviction test results cast doubt on his guilt: (1) his DNA represented "a mere 8% of the sample," far less than the "unknown male individual[, who] was the second highest contributor at 37%;" (2) the results were "inherently reliable," as they were less than the 20% threshold for "probabilistic genotyping of any minor contribution to the DNA mixture of three people;" (3) the PSP's conclusions were "both misleading and incomplete," because it did not utilize a sample for C.S. — A.P.'s admitted sexual partner — who may have represented the contributor of 37% of the DNA; and (4) the results were inconsistent with Anderson-Myles having sex with A.P. on February 17, 2015 because four "major alleles detected in . . . Anderson-Myles' reference profile were not observed . . . in the DNA sample taken from" the rectal swab. **Id**. at 24-25 (emphasis omitted). Anderson-Myles avers that his expert's testimony would thus have supported a finding

that Anderson-Myles and A.P. had sexual intercourse more than two days prior to the incident and C.S. was A.P.'s more recent sexual partner.

The PCRA court reasoned that it "properly dismissed [Anderson-Myles'] PCRA [p]etition because the DNA testing conclusively identified [Anderson-Myles] through **probative** and **inculpatory** evidence." PCRA Court Opinion, 3/6/24, at 5 (emphases in original). The court noted that "[t]his is **not** a case about whether the sexual interactions between the victim, A.P., and [Anderson-Myles] were consensual, but rather where A.P. stated that [Anderson-Myles] raped her, and [he] claimed that no sex occurred." **Id**. at 6 (emphasis in original). Therefore, the court concluded the post-conviction DNA testing did not demonstrate Anderson-Myles' actual innocence and would not have changed the outcome of trial.

After careful review, we affirm the PCRA court's ruling with respect to Anderson-Myles' request for a hearing on the DNA test results, albeit on different grounds than those set forth by the court. **See Commonwealth v. Tyler**, 234 A.3d 750, 753 (Pa. Super. 2020) (holding that this Court may affirm PCRA court's decision on motion for post-conviction DNA testing if there is any basis to support it in the record). Anderson-Myles filed a motion for post-conviction DNA testing, and the PCRA court granted it and directed a comparison of his DNA to the DNA retrieved from the rectal swab. This order "terminate[d] the existing process between the parties and decide[d] the merits of the sole claim raised in the motion." **Scarborough**, 64 A.3d at 610. While Anderson-Myles could have filed a petition pursuant to Section 9543.1(f)

to "commence[] separate and new litigation" concerning the DNA testing, he did not do so. *Id*.; *see also Hardy*, 337 A.3d at 391.

Thus, because Anderson-Myles did not file a PCRA petition following the DNA testing, the PCRA court had no legal authority on which to hold a hearing to consider his DNA expert's testimony. Section 9543.1(f) specifically contemplates that the PCRA court shall hold a hearing only after the petitioner files a petition raising grounds for relief related to the post-conviction DNA testing. *See* 42 Pa.C.S.A. 9543.1(f)(2) (stating that the PCRA court "shall conduct a hearing" following "receipt of a petition filed under [Section 9543.1(f)(1) and] any answer filed by the Commonwealth").

We recognize that Anderson-Myles' first petition for PCRA relief was pending at the time he filed his response to the Rule 907 notice and requested that the PCRA court consider his DNA expert's testimony. However, his pending petition did not address the DNA test results, and he did not seek leave of court to amend his petition to raise a new claim based on the testing. Accordingly, because Anderson-Myles did not comply with the procedure set forth in Section 9543.1(f) and file a petition following the grant of his motion for post-conviction DNA testing, his first issue merits no relief.[12]

---

[12] We note that, even if Anderson-Myles had filed a new petition after the DNA testing, Section 9543.1(f)(6) would have authorized the PCRA court to dismiss that petition. *See* 42 Pa.C.S.A. 9543.1(f)(6) (stating that "[i]f DNA testing conclusively identifies the DNA profile of the applicant on probative and inculpatory evidence, the court shall dismiss the petition and may make any further orders that are appropriate").

In his second and third issues, Anderson-Myles challenges the PCRA court's ruling that he did not show Trial Counsel was ineffective for failing to obtain and investigate the contents of A.P.'s rape kit. When assessing ineffectiveness claims, we presume counsel has rendered effective assistance. *See Commonwealth v. Washington*, 269 A.3d 1255, 1263 (Pa. Super. 2022) (*en banc*). To overcome the presumption, the petitioner must show that: "(1) the underlying claim is of arguable merit; (2) . . . counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Id*. (citation omitted). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. *See id*.

"Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary." *Commonwealth v. Johnson*, 966 A.2d 523, 535 (Pa. 2009). The unreasonable failure of counsel to adequately prepare for trial is "an abdication of the minimum performance required of defense counsel." *Id*. (citation omitted).

Anderson-Myles argues that Trial Counsel was ineffective for failing to obtain the rape kit and seek DNA testing of the samples therein because it would have led to favorable evidence for the defense. Anderson-Myles contends that A.P.'s trial testimony and her statements recorded in the SANE Report and Incident Report showed that "Anderson-Myles' DNA was all over

her body." Anderson-Myles' Brief at 29. He further notes that A.P. did not bathe before the forensic examination. Therefore, he contends that his DNA should "have been the main component of the DNA material besides A.P.'s DNA," but instead "his was a minor component" on the rectal swab and not identified on the vaginal swabs. *Id*. at 29-30. Consistent with his DNA expert's opinion, Anderson-Myles contends that the DNA evidence showed that C.S., rather than Anderson-Myles, "had sexual relations with A.P. [on] the day of the alleged rape." *Id*. at 30.

Anderson-Myles argues Trial Counsel lacked a reasonable strategy for not seeking the testing, as he failed to "fully develop [a] defense" and obtain "information that would have proven Anderon-Myles' innocence." *Id*. at 30-31. Anderson-Myles avers that Trial Counsel had "tunnel vision" by relying "solely on the defense that A.P. lied about the fact that she just met Anderson-Myles." *Id*. at 30. He further asserts, notwithstanding that "his DNA was faintly on the samples taken from A.P.," he sustained prejudice from the absence of DNA testing because it would have proven that he did not have intercourse with A.P. on the date of the incident.

In its opinion, the PCRA court first concluded that Anderson-Myles did not meet his burden of proving Trial Counsel failed to obtain the rape kit or DNA test results. The court observed that Trial Counsel "did not testify that he failed to obtain the rape kit but simply that he did not remember whether he obtained it." PCRA Court Opinion, 6/18/25, at 8. The court noted Trial Counsel's diligent work on the case, as evidenced by the numerous

continuances he requested, and that it was the Commonwealth's general practice to provide DNA reports.

The PCRA court further found that, even if Anderson-Myles showed Trial Counsel did not request the rape kit or investigate the DNA test results, he did not demonstrate resulting prejudice from counsel's omissions. The court noted that subsequent testing of the rectal swab showed the presence of Anderson-Myles' DNA to a very high degree of likelihood. "Thus," the court reasoned, "the DNA results actually undermined rather than supported [Anderson-Myles'] case." *Id*. at 9. The court determined that DNA testimony "was not useful regardless of the strategy [Trial Counsel] employed and therefore was not at all likely to change the outcome of the case in [Anderson-Myles'] favor." *Id*.

Based on our review, we conclude that the record supports the PCRA court's conclusion that Trial Counsel was not ineffective with respect to the investigation of the rape kit and DNA test results. *See Ortiz-Pagan*, 322 A.3d at 251. As the court noted, Anderson-Myles did not prove that Trial Counsel failed to investigate the rape kit or that he did not review the first round of DNA testing by the PSP in 2015. Instead, the evidence at the PCRA hearing only showed that Trial Counsel had limited memory of Anderson-Myles' trial and he failed to recall whether he requested or reviewed the rape kit or DNA evidence. *See* N.T., 6/28/22, at 15-16.

We further conclude that the PCRA court did not err in finding Anderson-Myles did not sustain prejudice. The only evidence he claims Trial Counsel

should have presented as a result of his investigation was the 2023 DNA test results following the grant of his motion for post-conviction DNA testing. However, the recent testing showed the DNA of one of the contributors on A.P.'s rectal swab was 1.6 quintillion times more likely to have originated from him than an unknown male. *See* Commonwealth's Motion to Dismiss PCRA Petitions, 9/1/23, Exhibit 2, at 1. Therefore, the results of the testing would not have aided Anderson-Myles' defense that he and A.P. had an existing romantic relationship and any sexual relations that occurred on February 17, 2015 were consensual. *See* N.T., 6/28/22, at 8, 42 (Trial Counsel discussing his trial defense theory). Moreover, as the PCRA court observed, evidence showing Anderson-Myles' DNA on A.P.'s rectum would not have been useful if his defense was that he last had sexual contact with A.P. "probably weeks beforehand." N.T., 2/27/23, at 15. No relief is due on Anderson-Myles' second and third issues.

Next, Anderson-Myles argues that the PCRA court erred by not finding Trial Counsel ineffective with respect to his cross-examination of A.P. Anderson-Myles contends that Trial Counsel overlooked "critical impeachment evidence, particularly prior inconsistent statements from the" SANE Report. Anderson-Myles' Brief at 32. Specifically, Anderson-Myles identifies several inconsistencies within the SANE Report and between that report and A.P.'s trial testimony: (1) A.P. identified Anderson-Myles to the SANE Nurse by his middle name and said that they were "just friends," but also stated she had just met him; (2) she told the SANE Nurse that Anderson-Myles choked her,

threw her, and held her down, yet the nurse found no bruising, wounds, or other indicia of trauma; and (3) she reported to the SANE Nurse that Anderson-Myles' fingers and tongue penetrated her vagina and rectum, but she did not testify at trial to any of these facts. PCRA Exhibit D-3, at 2, 5-6.

Anderson-Myles contends that Trial Counsel was also ineffective for failing to cross-examine A.P. with regard to inconsistencies between the Incident Report and her trial testimony, including that she: (1) identified him to police by his nickname of "Ace" but testified she had only just met him; (2) reported to police that Anderson-Myles' fingers and tongue penetrated her vagina and rectum but did not testify to the same at trial; (3) told the police that she had known him for three days but testified at trial she met him online two to three weeks prior; (4) did not inform the police that she lost a contact lens during the incident, although she testified to this at trial; and (5) stated to the police that she reported the rape to her mother at 9:00 p.m., while she testified that she told her mother at 5:30 p.m. PCRA Exhibit D-1-A, at 3-4; *see also* N.T., 12/28/17, at 10, 21, 30.

Anderson-Myles additionally argues that Trial Counsel was ineffective for failing to cross-examine A.P. regarding her testimony that she heard someone she believed to be Anderson-Myles' brother upstairs playing video games during the incident, when he in fact does not have a brother. *See* N.T., 12/28/17, at 14, 26, 35-37; *see also* N.T., 4/27/22, at 31 (Mother testifying that Anderson-Myles does not have a brother). Finally, Anderson-Myles contends that Trial Counsel was ineffective for failing to determine the

identity of the friend A.P. testified she called while at the store with Anderson-Myles after the sexual assault, as this individual "was the real prompt complaint witness" who could have shed light on what happened that day. Anderson-Myles' Brief at 37; *see also* N.T., 12/28/17, at 27-28.

Anderson-Myles contends that Trial Counsel offered no reasonable strategic basis for his cross-examination A.P., as he could not recall at the PCRA hearing the reasons he did not address her prior statements. *See* N.T., 6/28/22, at 17-28, 39-40. Anderson-Myles argues that he sustained prejudice from Trial Counsel's failures because effective cross-examination of A.P. and proper investigation of her account would have shown that "the story she told at trial was far different from that which she described the night of the incident." Anderson-Myles' Brief at 35. He reasons that "[e]ven if one or two of these inconsistencies could be excused, the sheer weight of these numerous inconsistencies created reasonable doubt." *Id*. at 39.

The PCRA court found that Anderson-Myles failed to show Trial Counsel's cross-examination of A.P. lacked a reasonable strategic basis. The court observed that counsel "employ[ed] a consent defense" supported with testimony from Garner, Mother, and Anderson-Myles' grandmother that he and A.P. had been in a romantic relationship. PCRA Court Opinion, 6/18/25, at 6. The court determined that Trial Counsel reasonably focused his cross-examination of A.P. "on the extent of their relationship and the consensual nature of the encounter," even if "another attorney might have employed a strategy of denying any sexual activity occurred at all." *Id*. at 7. The court

additionally found that it was reasonable for Trial Counsel not to cross-examine A.P. regarding the SANE Report, because her testimony was largely consistent with the report and "[i]ntroducing it would likely have even strengthened the victim's credibility." *Id*.

The PCRA court additionally determined that Anderson-Myles did not sustain prejudice from Trial Counsel's failure to refer to A.P.'s prior statements when cross-examining her. The court reasoned that any inconsistencies with her trial testimony "were few in number and insignificant to the case." *Id*. The court further noted that any inconsistencies were "easily explainable due to the less intimidating environment of the hospital compared to the courtroom, the passage of years between the accounts, and the trauma of the event." *Id*. at 8. Therefore, the court concluded that cross-examination of A.P. regarding the "minor and inconsequential" inconsistencies with her prior statements would not have altered the outcome of the case. *Id*.

After careful review, we conclude that the record supports the PCRA court's conclusion that Trial Counsel was not ineffective in his cross-examination of A.P. *See Ortiz-Pagan*, 322 A.3d at 251. As the PCRA court found, Trial Counsel had a reasonable basis for not cross-examining A.P. on any inconsistencies between her trial testimony and prior statements because counsel based his defense on testimony showing that Anderson-Myles and A.P. were in a romantic relationship and their sexual relations were consensual. A.P.'s statements to the police and SANE Nurse would in fact have bolstered her trial testimony — and contradicted the defense theory — as she

consistently stated that she was not in a relationship with Anderson-Myles and met him for the first time in person on the date of the incident.

Furthermore, A.P.'s trial testimony was generally consistent with her prior statements. Not only did A.P. provide similar overarching descriptions of the abuse, but she noted specific details, both in the prior statements and at trial, such as that the abuse began as the two were sitting on the couch watching a Netflix show, and Anderson-Myles followed her to the store afterwards where she bought Cheez-Its. **See** N.T., 12/28/17, at 15-28; **see also** PCRA Exhibit D-1-A, at 3-4; PCRA Exhibit D-3, at 2-3, 10. While A.P. provided certain additional details in her prior statements absent from her testimony, she readily explained the reason for this at trial: "[S]ome parts I'm not going to say I forced myself to forget but I just like — certain parts are blurry." N.T., 12/28/17, at 20.

The majority of the alleged inconsistencies Anderson-Myles identified between A.P.'s testimony and her prior statements are not inconsistencies at all. A.P. explained that, even though she had just met Anderson-Myles in person on the date of the assault, she knew both his nickname, Ace, and middle name, Kisheen, because he used his nickname on Instagram and she "heard him say like Kasheem or something." N.T., 12/28/17, at 10; **see also** PCRA Exhibit D-1-A, at 3. Thus, her knowledge of his nickname and middle name were not indicative of a long-standing relationship. A.P.'s statement to the SANE Nurse she was "just friends" with Anderson-Myles was consistent with her explanation that they developed an online relationship but met for

the first time in-person on the day of the assault. PCRA Exhibit D-3, at 2; *see also* N.T., 12/28/17, at 10.

Contrary to Anderson-Myles' claim that A.P. testified she reported the assault to her mother at 5:30 p.m. when the police report indicates this occurred at 9:00 p.m., A.P. testified that she returned home at 5:30 p.m. and did not immediately tell her mother what occurred. *See* N.T., 12/28/17, at 30 (A.P. testifying that she did not report the sexual assault to her mother as "the first thing [she] said when [Mother] walked through the door"). Additionally, A.P. did not testify Anderson-Myles' brother was upstairs playing video games during the incident but only that she heard a male voice and that it was Anderson-Myles who "*reassured* [her] it was his brother." N.T., 12/28/17, at 36 (emphasis added).

While A.P. did not testify that Anderson-Myles "choked" her as she had informed the SANE Nurse, her description at trial of how he "pushed" and "forced" her face so hard into the couch that her contact lens fell out was substantially similar. N.T., 12/28/17, at 21-22; *see also* PCRA Exhibit D-3, at 10 (SANE Report stating that A.P. reported that Anderson-Myles "threw [her] on the couch but was still holding onto [her] neck" and "the more [she] tried to fight him, the more he choked [her]"). Finally, Anderson-Myles has not demonstrated an inconsistency regarding A.P.'s testimony that she spoke on the phone with a friend while she was at the store with him, as she also reported to the SANE Nurse that she called a friend after the assault. *See* N.T., 12/28/17, at 27-29; *see also* PCRA Exhibit D-3, at 10. In any event,

Anderson-Myles does not identify this witness or indicate what testimony she would have provided to aid his defense.

Therefore, as A.P.'s trial testimony was generally consistent with her prior statements, with minor differences attributable to the passage of time and the different environments in which she provided her accounts, the PCRA court did not err in finding that Trial Counsel's examination of A.P. did not prejudice Anderson-Myles. "[M]ere dissimilarities or omissions in prior statements . . . do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." *Commonwealth v. Luster*, 71 A.3d 1029, 1043 (Pa. Super. 2013) (*en banc*) (citation omitted). Accordingly, because the evidence supports the conclusion that Trial Counsel reasonably limited his cross-examination of A.P. and Anderson-Myles suffered no prejudice, his fourth issue warrants no relief.

Anderson-Myles fifth issue challenges the PCRA court's dismissal of his ineffectiveness claim related to Trial Counsel's failure to call Stepfather as a defense witness. "A defense attorney's failure to call certain witnesses does not constitute *per se* ineffectiveness." *Commonwealth v. Cox*, 983 A.2d 666, 693 (Pa. 2009). To establish that defense counsel was ineffective for failing to call a witness at trial, the PCRA petitioner must demonstrate that:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the

witness was so prejudicial as to have denied the defendant a fair trial.

***Commonwealth v. Medina***, 209 A.3d 992, 998 (Pa. Super. 2019) (citation omitted). The determination of whether a defendant suffered prejudice from failure to call a witness "must necessarily include some measure of a finding that the witness[ was] credible." ***Johnson***, 966 A.2d at 540.

As noted above, A.P. testified at trial that when she first arrived at Anderson-Myles' home on February 17, 2015, his "dad" was also there but he said he was "going to the store" and left before the sexual assault began. N.T., 12/28/17, at 14. Stepfather testified at the PCRA hearing that he came home on the date of the incident to find Anderson-Myles and A.P. — who Stepfather understood to be his "girlfriend" — sitting on the couch and watching television. N.T., 4/27/22, at 9-12, 18. Stepfather observed Anderson-Myles and A.P. were "friendly with each other" and there was no indication of an argument or struggle. ***Id***. at 11, 13. When Stepfather left the home ten to fifteen minutes later, he asked Anderson-Myles and A.P. to also leave because it was a "rule of the house" for the children not to have company without an adult present. ***Id***. at 12.

Anderson-Myles argues that he met all the requirements to show Trial Counsel's ineffectiveness for failing to call Stepfather. Stepfather appeared at the PCRA hearing, testified to his recollection of the events of February 17, 2015, and indicated in his certification attached to the PCRA petition that he was willing to testify. ***See*** PCRA Exhibit D-1-E, at 1; ***see also*** N.T., 4/27/22,

at 9 (Stepfather testifying that "everything in [the certification was] correct"). Anderson-Myles asserts that Trial Counsel was aware that Stepfather potentially had information related to the case because he wrote Stepfather's name in his notes, yet he could not recall interviewing him. **See** N.T., 6/28/22, at 12-14.

With respect to prejudice, Anderson-Myles contends that Stepfather's "account directly contradict[ed] A.P.'s testimony at trial," as it "showed [she and Anderson-Myles] had an ongoing relationship and were not in the home when A.P. said the rape occurred." Anderson-Myles' Brief at 45. Anderson-Myles avers Stepfather "would have lent a critical voice to" his defense. **Id**. Anderson-Myles further argues that Trial Counsel offered no reasonable basis for his actions, as he could not recall why he did not contact Stepfather in advance of trial. **See** N.T., 6/28/22, at 36.

In its opinion, the PCRA court concluded that Anderson-Myles failed to prove Stepfather was available and willing to testify for the defense. The court noted that Stepfather acknowledged he was aware of the seriousness of the charges against Anderson-Myles but chose not to attend his trial, citing his troubled relationship with Mother at the time.

The PCRA court additionally determined that Anderson-Myles did not show prejudice because his account of the events of February 17, 2015 lacked credibility. The court observed that Stepfather's "testimony, if true, could have exonerated his stepson from a rape charge, yet he failed to present his knowledge at any point before or during the bifurcated trial or at sentencing."

PCRA Court Opinion, 6/18/25, at 6. The court noted that Stepfather "still has not provided a reason for this extraordinary delay." ***Id***.

Upon review, we conclude that the record supports the PCRA court's findings that Anderson-Myles did not prove Stepfather was available and willing to testify for the defense at trial and his testimony regarding the events of February 17, 2015 was not credible. ***See Ortiz-Pagan***, 322 A.3d at 251. While Stepfather testified at the PCRA hearing that the representations in his certification attached to the petition were accurate, he did not specifically confirm that he was available and willing to testify at trial. ***See*** N.T., 4/27/22, at 9; ***see also*** PCRA Exhibit D-1-E. Indeed, Stepfather's testimony belied his willingness and availability, as he did not attend any portion of the trial, he was estranged from Mother at the time, and he attended an out-of-state funeral on one of the trial dates. ***See*** N.T., 4/27/22, at 19-20. Indeed, Stepfather testified at the PCRA hearing that he did not attend the second day of trial because he "wasn't close to" Mother and "was having a domestic situation with [her] at that time." ***Id***. at 20. Stepfather's testimony regarding his reasons for not attending trial and his failure to explain why he did not relate his observations earlier also support the PCRA court's finding that his account of the events of February 17, 2015 was not credible. We are bound by the court's credibility findings when supported by evidence, as they are here. ***See Ortiz-Pagan***, 322 A.3d at 251. Therefore, no relief is due on Anderson-Myles' fifth issue.

In his sixth issue, Anderson-Myles challenges the PCRA court's dismissal of his ineffectiveness claim based on Trial Counsel's failure to present the alleged text and Instagram messages sent by A.P. to Mother, Gray, and Garner. As the PCRA court based its ruling on Anderson-Myles' failure to authenticate the at-issue messages, we review the law pertaining to authentication of digital evidence:

> Pennsylvania Rule of Evidence 901 governs the authentication of evidence. As a general rule "authentication requires a low burden of proof: [t]he proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be." *Commonwealth v. Jackson*, 283 A.3d 814, 818 (Pa. Super. 2022) (quoting Pa.R.A.P. 901(a)) (other citation omitted).

> Rule 901(b)(11) specifically addresses the authentication of "digital evidence," which [includes] "emails, text messages, social media postings, and images." Pa.R.E. 901(b)(11), [*Comment*]. The rule provides that a proponent may show that an individual or entity is connected to digital evidence through:

> (A) direct evidence such as testimony of a person with personal knowledge; or

> (B) circumstantial evidence such as:

> (i) identifying content; or

> (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(b)(11).

> The comment to Rule 901 further clarifies that "the proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." Pa.R.E. 901, [*Comment*]. Furthermore,

[c]ircumstantial evidence of identifying content under Pa.R.E. 901(b)(11)(B)(i) may include self-identification or other distinctive characteristics, including a display of knowledge only possessed by the author. Circumstantial evidence of content may be sufficient to connect the digital evidence to its author.

Circumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication of authorship of digital evidence under Pa.R.E. 901(b)(11)(B)(ii). *See, e.g., Commonwealth v. Mangel*, 181 A.3d 1154, 1163 (Pa. Super. 2018) (social media account bearing defendant's name, hometown, and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by defendant). However, this evidence is probative in combination with other evidence of the author's identity.

Pa.R.E. 901, [*Comment*].

*Commonwealth v. Watkins*, 315 A.3d 145, 149-50 (Pa. Super. 2024).

Anderson-Myles argues that there was arguable merit to his claim concerning the text and Instagram messages, as they showed that A.P. was jealous of Anderson-Myles' interest in other women, she lied during her trial testimony, and he did not sexually assault her. *See* PCRA Exhibits D-1-B, at 4, D-1-C, at 3-7, D-1-D, at 3-4. Anderson-Myles contends that his PCRA hearing testimony, as well as that of Mother, Gray, and Garner, demonstrated Trial Counsel was aware of the messages. *See* N.T., 4/27/22, at 27-30, 47, 64; *see also* N.T., 6/28/22, at 54-57. In addition, Anderson-Myles notes that Trial Counsel recalled viewing the text messages, and ADA Boggs testified that Trial Counsel showed him the Instagram messages. *See* N.T., 6/28/22, at 31, 66-69.

Anderson-Myles avers that there was sufficient evidence presented at the PCRA hearing to authenticate the messages. With respect to the text messages sent to Mother, Anderson-Myles notes that Mother testified she had a preexisting relationship with A.P. and A.P. had called in the past using the same phone number to speak with Anderson-Myles. *See* N.T., 4/27/22, at 28-29. Anderson-Myles also relies on the content of the text messages, in which the author of the messages identified herself by A.P.'s first name and addressed Mother by her first name and Anderson-Myles by his middle name. *See* PCRA Exhibit D-1-B, at 4. Regarding the Instagram messages, Anderson-Myles argues there were "significant circumstances of reliability," when viewed in combination with each other and the text message. Anderson-Myles' Brief at 52. He asserts that the Instagram messages each referred to Anderson-Myles, reflected a consistent motive that A.P. lied in court to take revenge on Anderson-Myles for his relationships with other women, and contained "organic and evolving repartee" consistent with the circumstances of the case. *Id*. at 56.

Anderson-Myles contends that Trial Counsel lacked a reasonable basis to not present the messages at trial or via post-sentence motion, as he acknowledged he had no memory of the Instagram messages to Gray and Garner and did not recall how he investigated the text messages to Mother. *See* N.T., 6/28/22, at 30-31. Anderson-Myles argues that the failure to present the messages to the trial court was "extremely prejudicial" because his "case revolved around credibility, and the[]messages show[ed] that A.P.

had a motive to lie, and did lie, to retaliate against [Anderson-Myles] because she was a woman scorned by him." Anderson-Myles' Brief at 57. He contends that the messages were "a fruitful ground for impeachment" and "likely would have been strong substantive evidence that Anderson-Myles did not commit" the offenses. *Id*. at 57-58.

The PCRA court concluded that Trial Counsel had a reasonable strategic basis for not seeking the admission of the text and Instagram messages — that he could not authenticate him. The court noted that Anderson-Myles did not present the phone A.P. used to send the text messages and did not link A.P. to the phone number on the screenshots of the messages through phone records. The court further observed that the phone number of the sender differed from the two phone numbers listed for A.P. on the Incident Report. *See* PCRA Exhibit D-1-A, at 2. With respect to the Instagram messages, the court determined that Anderson-Myles also failed to link the "bhadhabits_" account to A.P., and in fact he admitted evidence showing a different username of "Bhad_Habits." *See* N.T., 6/28/22, at 70-72.

The PCRA court thus found the testimony of Mother, Gray, and Garner that A.P. sent the text and Instagram messages was "based on their personal assumptions and [was] unpersuasive" to authenticate A.P. as the sender of the messages. PCRA Court Opinion, 6/18/25, at 4. The court found that Trial Counsel had further reasonable basis for not presenting the messages to the trial court based on "the convenient timing of their occurrence" and the messages' "illogical content[, which] created suspicion of fraud." *Id*. at 4-5.

After careful review, we conclude that the record supports the PCRA court's conclusion that Trial Counsel reasonably decided not to introduce the text and Instagram messages based on his inability to authenticate them. ***See Ortiz-Pagan***, 322 A.3d at 251. With respect to the Instagram messages, Anderson-Myles did not present subscriber records from Instagram that connected the author, "bhadhabits_," to any particular user, email address, or phone number. ***See Jackson***, 283 A.3d at 819 (finding social media messages properly authenticated when Commonwealth produced information from multiple accounts containing biographical information and photographs of defendant that were consistent with accounts the defendant admitted he controlled). Instead, Anderson-Myles only introduced screenshots of the messages from the phones of his friends, Gray and Garner. ***See*** PCRA Exhibits D-1-C, at 3-7, D-1-D, at 3-4. While the messages contained "contextual clues" that would appear to indicate A.P. was the author, all the information in the messages was known to anyone following the trial, rather than any unique information only known by A.P. ***Mangel***, 181 A.3d at 1164; ***see also*** Pa.R.E. 901, *Comment* (noting that "self-identification or other distinctive characteristics, including a display of knowledge only possessed by the author" may be sufficient for authentication of digital evidence). Notably, the screenshots do not include a date or time that confirm when Gray and Garner allegedly received them or a profile picture depicting A.P. ***See Mangel***, 181 A.3d at 1163 (affirming trial court's denial of authentication of social media messages based in part on fact that messages did not show date and time).

Gray's and Garner's testimony also failed to connect A.P. to the "bhadhabits_" username. Garner testified that he "knew [A.P.] but not personally" and "she reached out to" him on Instagram shortly after he testified in Anderson-Myles' defense. N.T., 4/27/22, at 60-61, 69. However, Garner did not testify that he had previously communicated with A.P. on Instagram or he was aware that "bhadhabits_" was her username. Gray acknowledged that he had no pre-existing relationship with A.P. and received the messages from "bhadhabits_" — whom he believed to be "a female coming on to" him — out of pure coincidence. *Id*. at 39-40, 49. Therefore, both Garner and Gray based their conclusion that A.P. was the author on contextual clues within the messages themselves, rather than on independent information that would connect the "bhadhabits_" account to A.P.

Additionally, evidence at the PCRA hearing called into question the veracity of the Instagram messages. *See Jackson*, 283 A.3d at 818-19 (recognizing that "social media evidence presents challenges for authentication because of the ease with which a social media account may be falsified") (citation omitted). The messages sent to Gray reference an individual named "Abdel," which contradicts A.P.'s testimony she knew Anderson-Myles by his middle name and nickname and did not recognize his first name of Abdel. *See* N.T., 12/28/17, at 10; *see also* PCRA Exhibit D-1-C, at 6. ADA Boggs testified that A.P. denied writing the messages or using "bhadhabits_" as her username and a detective was unable to verify the account belonged to her. *See* N.T., 6/28/22, at 67-69. ADA Boggs also

recalled an incident at the outset of the case where he reviewed a handwritten letter purportedly from A.P. denying the rape occurred, which ADA Boggs was able to verify as false after speaking to A.P. and reviewing a sample of her handwriting. *See id*. at 66-68. Anderson-Myles also presented, at the PCRA hearing, a printout of an Instagram account showing a photograph of A.P. but with the different username of "Bhad_Habits." *See id*. at 70-72. Accordingly, the PCRA court appropriately found that Trial Counsel reasonably decided not to introduce the Instagram messages as they were not capable of authentication.

The question of whether Trial Counsel could have authenticated the text messages is a closer case, as Mother testified that A.P. had previously called from the same phone number to talk with Mother and Anderson-Myles. *See* N.T., 4/27/22, at 28-29. The text message exchange also reflected the date and time they were allegedly sent, and the author referred to Anderson-Myles by his middle name, consistent with A.P.'s testimony. *See* PCRA Exhibit D-1-B, at 4.

However, Anderson-Myles again relied solely on the screenshots and the testimony of the recipient of the text message. He did not produce phone records or any other evidence to show A.P. owned the phone, or was connected to the phone number, that sent the text messages to Mother. Furthermore, the Incident Report listed two mobile phone numbers for A.P., neither of which corresponds to the number that allegedly sent the messages to Mother. *See* PCRA Exhibit D-1-A, at 2.

Therefore, we find no error in the PCRA court's conclusion that Anderson-Myles could not authenticate the text messages. ***See Commonwealth v. Orr***, 255 A.3d 589, 601 (Pa. Super. 2021) (finding text messages properly authenticated based on contextual clues within messages in combination with evidence defendant owned the phone); ***see also Commonwealth v. Wright***, 255 A.3d 542, 551 (Pa. Super. 2021) (same). Even assuming Anderson-Myles presented sufficient evidence to authenticate the messages, there was ample support for the PCRA court's alternate holding that Trial Counsel acted reasonably by not introducing the messages based on "the convenient timing of their occurrence" and the messages' "illogical content[, which] created suspicion of fraud." PCRA Court Opinion, 6/18/25, at 4-5. Anderson-Myles' sixth issue merits no relief.

In his final issue, Anderson-Myles submits that the PCRA court erred by not granting him a new trial based on the cumulative prejudice of his ineffectiveness claims. He contends the accumulated prejudice from Trial Counsel's failure to properly investigate, request DNA testing, present exculpatory evidence, and cross-examine A.P., "even if . . . individually . . . insufficient, collectively . . . clearly showed prejudice." Anderson-Myles' Brief at 58-59.

Our Supreme Court has held that in general "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." ***Commonwealth v. Elliott***, 80 A.3d 415, 450 (Pa. 2013). However, when multiple ineffective assistance claims failed based upon a

finding of a lack of prejudice, "then the cumulative prejudice from those individual claims may properly be assessed." *Id.* The Court has cautioned that "nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim." ***Commonwealth v. Hutchinson***, 25 A.3d 277, 319 (Pa. 2011). "A bald averment of cumulative prejudice does not constitute a claim." *Id.*

The PCRA court determined that cumulative prejudice of Anderson-Myles' claims did not compel a new trial as the claims "lack[ed] prejudice individually" and "[e]ven when considering the claims cumulatively, there [was] still no prejudice to" Anderson-Myles. PCRA Court Opinion, 6/18/25, at 10.

Here, Anderson-Myles presents nothing more than a "bald averment of cumulative prejudice," and fails to advance "a specific, reasoned, and legally and factually supported argument for" his claim. ***Hutchinson***, 25 A.3d at 319 Accordingly, we conclude that the PCRA court properly found that the cumulative prejudice of Anderson-Myles' claims does not warrant the grant of a new trial. ***See id***. His sixth issue merits no relief.

For the foregoing reasons, we conclude that the record supports the dismissal of Anderson-Myles' first PCRA petition and that the PCRA court did not err by refusing to hold a hearing following the grant of his motion for post-conviction DNA testing. We therefore affirm the court's October 10, 2023 order.

Order affirmed.

Judge Murray joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/14/2026